**Roy Lee ENGBERG, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 83–29.**

Supreme Court of Wyoming.

June 27, 1984.

Rehearing Denied Aug. 13, 1984.

Certiorari Denied Dec. 3, 1984.
See 105 S.Ct. 577.

Leonard D. Munker, State Public Defender; Sylvia Lee Hackl, Appellate Counsel; John Doidge, Student Intern; Bonnie Fransen, Student Intern; and Gerald M. Gallivan, Director, Wyoming Defender Aid Program, Laramie, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Criminal Division; and John Renneisen, Sr. Asst. Atty. Gen., for appellee.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN, and CARDINE, JJ.

THOMAS, Justice.

Once again this court is called upon to perform the somber duty of reviewing a

capital sentence imposed by a jury in a first-degree murder case to determine whether it is justified under the law. The appellant also was convicted of armed robbery. The issues posed and argued by the appellant encompass his contentions that individual voir dire is constitutionally required in a capital case; the State should not selectively use peremptory challenges in such a case; there is insufficient evidence of intent to kill in this case; the jury was improperly permitted to consider that the murder was committed in the course of a robbery and for pecuniary gain as separate aggravating circumstances; and the imposition of the death penalty is excessive and disproportionate to the penalty imposed in similar cases. Our examination of the record and the law persuades us that there is no error with respect to any of the claims made by the appellant, and no other error exists in the record of these proceedings which requires reversal. We affirm the convictions and the judgment and sentences.

The specific issues articulated by the appellant are:

"1. Whether Appellant was denied his constitutionally-guaranteed right to a fair trial by an impartial jury through the trial court's refusal to permit individual voir dire and the State's selective use of peremptory challenges to create a 'death-qualified' jury.

"2. Whether the trial court erred in denying Appellant's motion for judgment of acquittal, new trial and arrest of judgment, since insufficient evidence of intent to kill existed to justify imposition of the death penalty.

"3. Whether the jury improperly considered as separate aggravating circumstances that the murder was committed (1) in the course of a robbery and (2) for pecuniary gain, which consideration impaired the required weighing of aggravating and mitigating circumstances and mandates that the death penalty be vacated.

"4. Whether the imposition of the death penalty is excessive and disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

On December 22, 1981, Vernon Rogers and his sister, Kay Otto, were employed by Wells Fargo Company in the operation of an armored van on a pick-up and delivery route. At approximately noon on that day they went to the Buttrey-Osco Store in the Mountain Plaza Shopping Center in Casper, Wyoming, to deliver cash and change and to receive cash, food stamps, checks and other receipts from the store for delivery to a bank. They did pick up in the store a bag containing these several items in the amount of $13,400, of which approximately $4,200 was cash. When they left the store Vernon Rogers was shot and killed.

Rogers was walking in front of Otto, who was carrying the transaction bag, as they exited the store through double sliding doors on its west side. As they passed the second sliding door, a Caucasian male, wearing a distinctive dark orange ski cap and a brown leather jacket, pulled a revolver from concealment, said to Vernon Rogers "Hey," and shot him. When Otto attempted to flee into the store, she stumbled and fell. The assailant caught up with her between the two sliding doors and repeatedly demanded that she turn over the transaction bag. Ultimately he took it from her and escaped on foot in a westerly direction through the parking lot. He fired at least one additional shot in the direction of a witness, apparently to discourage any possible pursuit. Vernon Rogers died at the scene. His heart and right lung were pierced by a single .38 caliber bullet.

The only factual issue at the trial of this case was the identity of the perpetrator. The appellant conceded that the crime had been committed substantially as the witnesses described it. A customer who had left the store just prior to the murder and robbery and observed Engberg standing near the exit, a store employee who was on his way to lunch and was in his truck in the parking lot at the time of the crime, and Kay Otto all identified Engberg as the perpetrator of these crimes. The record

discloses that they were satisfied with their identification even though there were significant discrepancies in the original identifying data they furnished to the Casper Police Department. The store employee apparently was the intended target of the shot that the appellant fired as he was fleeing from the scene.

In addition to the eyewitness testimony the State relied upon circumstantial evidence. The appellant was residing in Casper with his family, and they lived in a mobile home some two miles from the crime scene. The appellant was unemployed and out of money. He had collected his last paycheck from his work as a house painter on November 14, 1981, and he still owed his former employer $200, which had been advanced to him early in November of 1981. His wife had qualified for AFDC assistance during the early part of November 1981. His rent of $100 per week on the mobile home was a week in arrears, and the appellant and his wife had been pawning various items in a Casper pawn shop, with the most recent transaction, on December 17, 1981, being an eleven-dollar loan on a circular saw and drill.

Sometime before 1:00 p.m. on December 22, 1981, the appellant's wife paid the past-due rent on the mobile home and the next week's rent in advance, a total of $200. On that same day the appellant left Casper with his family. No one was advised of their departure, and the mobile home was abandoned. Late that afternoon the appellant purchased a used automobile in Rawlins, Wyoming, for $1550, which he paid with fourteen one-hundred-dollar bills and three fifty-dollar bills. He did not trade in his 1970 Plymouth sedan, and actually made the purchase in a fictitious name, which was different from the fictitious name under which he had been living in Casper. The following morning the appellant's wife, also employing a fictitious

name, arranged to have the 1970 Plymouth towed to a local garage for repairs. Neither appellant nor his wife made any further contact with the garage about that vehicle in which the family traveled from Casper to Rawlins.

Police officers discovered in a pocket of a vest found in the mobile home a round of .38 caliber ammunition of the kind that an expert testified had killed Vernon Rogers. In the vehicle abandoned in Rawlins an empty box for the same ammunition was discovered. Five more rounds were discovered in the appellant's motel room in Las Vegas, where he ultimately was arrested, and one of those was of the exact type that the expert testified had killed Vernon Rogers. When the 1975 Plymouth Fury, which was purchased in Rawlins, Wyoming, was searched, an orangish multi-colored ski cap and a brown lightweight jacket, which resembled those worn by the assailant, were discovered. After the appellant's arrest the transaction bag with the cash taken from it was found by two Wyoming residents who were returning from Denver, Colorado, with their families. It was located at a site which the appellant would have passed in traveling from Rawlins, Wyoming, to Salt Lake City, Utah. The appellant and his wife at various times had pawned a .38 caliber revolver. An expert witness testified that the round which killed Vernon Rogers could have been fired from a revolver of the type which the appellant and his wife had from time to time pawned. The murder weapon never was recovered.

On January 6, 1982, the appellant was charged by a criminal complaint in the County Court of Natrona County, Wyoming, with two counts of first-degree murder of Vernon Rogers, in violation of § 6–4–101(a), W.S.1977.[1] Count I charged premeditated murder of Vernon Rogers, and Count II charged the felony murder of

---

1. Section 6–4–101(a), W.S.1977, provides:
 "(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any rape, sexual assault, arson, robbery, burglary, or by administering poison or causing the same to be done, kills any human being, or whoever purposely and with premeditated malice kills any peace officer, corrections employee or fireman acting in the line of duty, is guilty of murder in the first degree."

Vernon Rogers in the perpetration of a robbery. In Count III the appellant was charged with the armed robbery of Kay Otto in violation of § 6–4–402, W.S.1977.[2] A criminal warrant was issued based upon the complaint, and it was executed on March 3, 1982.

The preliminary hearing for the appellant was held on March 18, 1982. He then was bound over for trial in the District Court of the Seventh Judicial District in Natrona County, Wyoming.

The Information was filed in the district court on March 22, 1982, and it charged the same offenses as had been included in the criminal complaint. The appellant was arraigned on March 23, 1982, and he entered pleas of not guilty to all three counts. On April 12, 1982, the appellant filed a series of motions in the district court. One of those was a motion for change of venue, which was granted on October 29, 1982, and the case was tried in Converse County, Wyoming. On September 24, 1982, a Motion for Individual Voir Dire was filed by the appellant in which the only specific claim made was that it was necessary because of extreme pretrial publicity, and that it would be impossible to question jurors individually in front of the entire panel without poisoning the panel as to the past nature of the defendant as reflected in a particular newspaper article. This was followed by a motion on October 1, 1982, filed by the State of Wyoming for individual voir dire examination which was limited to the death-qualifying portion of the jury selection process. The respective motions for individual voir dire were denied on October 28, 1982.

The case ultimately came on for trial before the jury in Converse County beginning on November 30, 1982. At the conclusion of the voir dire examination counsel for the appellant moved for a mistrial because the State had used its peremptory challenges to exclude those prospective jurors who had indicated reservations about capital punishment. The case was submitted to the jury on December 9, 1982, after the State and the appellant had agreed that Counts I and II of the Information should be merged and the case submitted to the jury only on the theory of a felony murder and the count of aggravated robbery. On the same day the jury returned its verdict finding the appellant guilty on both counts. The penalty phase of the case then was tried on December 10, 1982, and the jury recommended that capital punishment be imposed as to the murder count.

On December 20, 1982, the court formally pronounced its sentences. The appellant was sentenced to twenty-five to thirty years on the aggravated robbery count, and he was sentenced to death for the felony-murder conviction. On the same date that the "Judgment on the Verdict: Sentence" was entered the appellant filed a Motion for Judgment of Acquittal, New Trial, and Arrest of Judgment, which was denied by the court on January 7, 1983, and the appeal to this court followed. We note in passing that this is an appeal prosecuted by the appellant; it is not simply an automatic review under the provisions of § 6–4–103, W.S.1977.

The appellant's articulation of his first issue actually encompasses two propositions. First he contends that the denial of individual voir dire in a setting sequestered from the other veniremen resulted in the creation of a "presumption of guilt" in the minds of the ultimate members of the jury. The appellant urges that this factor was sufficient to inhibit a fair and impartial jury as constitutionally mandated by the

---

**2.** Section 6–4–402, W.S.1977, provided as follows:

"Whoever forcibly and feloniously takes from the person or possession of another any property of value, by violence or by putting in fear, when a firearm or other deadly weapon is used or exhibited in the commission of the offense, is guilty of aggravated robbery and shall be imprisoned in the penitentiary for not less than five (5) years nor more than fifty (50) years."

due-process clauses of the state and federal constitutions.[3]

In the recent case of *Jahnke v. State*, Wyo., 682 P.2d 991 (1984), we again acknowledged the significance of voir dire in the trial of a criminal case. In *Hopkinson v. State*, Wyo., 632 P.2d 79 (1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); and *Lopez v. State*, Wyo., 544 P.2d 855 (1976), we recognized the important role and vital place of voir dire in the truth-seeking process. Early in the jurisprudence of this state the court was concerned with voir dire examination in a capital case. See e.g., *Johnson v. State*, 29 Wyo. 121, 211 P. 484 (1922). We have held that it is not error to inquire of jurors on voir dire regarding their possible scruples (or lack thereof) with respect to imposition of the death penalty. *State v. Aragon*, 41 Wyo. 308, 285 P. 803 (1930). Indeed the third cause for challenge enumerated in § 7–11–105, W.S.1977, makes such inquiry essential.[4]

In *Pixley v. State*, Wyo., 406 P.2d 662 (1965), this court held that counsel for the State of Wyoming in a first-degree murder prosecution could ask all of the potential jurors whether they thought there could exist a crime so severe, heinous and cruel as to warrant their imposing death on the convicted defendant. We there affirmed the proposition that the State had the right and a duty in a case in which capital punishment could be imposed to determine whether the minds of any potential jurors were foreclosed to the imposition of death "no matter how terrible, horrible, cruel, vicious and depraved the crime may be."

The desideration and methodology of voir dire examination of the jurors in a capital case are familiar matters in this court. Rule 25(a), W.R.Cr.P., reaffirms the place of voir dire in a criminal case, but it also establishes the proposition that the administration of the voir dire examination is within the control of the trial judge. This proposition is reinforced, as we noted in *Jahnke v. State*, supra, by Rule 17 of the Uniform Rules for the District Courts of the State of Wyoming.[5] Conceding our

---

3. Article 1, § 6, Wyoming Constitution, provides:

 "No person shall be deprived of life, liberty or property without due process of law."

 Amendment XIV, United States Constitution, provides in pertinent part:

 " * * * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

4. The grounds for challenge for cause in § 7–11–105, W.S.1977, are:

 "(a) The following shall be good cause for challenge to any person called as a juror on any indictment:

 "(i) That he was a member of the grand jury which found the indictment;

 "(ii) That he has formed or expressed an opinion as to the guilt or innocence of the accused, or is biased or prejudiced for or against the accused;

 "(iii) In indictment for an offense, the punishment whereof is capital, that his opinions are such as to preclude him from finding the accused guilty of an offense punishable with death;

 "(iv) That he is a relation within the fifth degree to the person alleged to be injured, or attempted to be injured, by the offense charged or to the person on whose complaint the prosecution was instituted, or to the defendant;

 "(v) That he has served on a petit jury which was sworn in the same cause against the same defendant, and which jury either rendered a verdict which was set aside, or was discharged after hearing the evidence;

 "(vi) That he has served as a juror in a civil case brought against the defendant for the same act;

 "(vii) That he has been subpoenaed as a witness in the case.

 "(b) The same challenges for cause shall be allowed in criminal prosecutions that are allowed to parties in civil cases."

5. Rule 25(a), W.R.Cr.P., provides:

 "(a) *Examination of jurors.*—The parties, or their attorneys, may conduct the examination of prospective jurors, but such examination shall be under the supervision and control of the court, and the court may itself conduct such further examination as it deems proper. (See Rule 17, D.Ct.)"

 Rule 17, Uniform Rules for the District Courts of the State of Wyoming provides:

 "The only proper purpose of voir dire of jurors is to select a panel of six (6) jurors in a civil case, twelve (12) jurors if specific demand is made, and twelve (12) jurors in a criminal case, who will fairly and impartially

acknowledgement of the importance and necessity of voir dire examination in a criminal case, we also defer to the discretion of the trial court with respect to the bounds of the voir dire examination. *Hopkinson v. State,* supra. Obviously it is within that discretionary control of the trial judge to determine whether the voir dire will be conducted with the individual juror being examined while sequestered from the remainder of the panel. Recently, in *Press-Enterprise Company v. Superior Court of California, Riverside County,* —— U.S. ——, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), the Supreme Court of the United States added new dimensions to the polemic of closed voir dire examinations.

■ The majority rule with respect to the individual examination of jurors is that, like the other elements of managing voir dire examination, this decision is within the sound discretion of the court. *Fredericks v. United States,* 292 F. 856 (9th Cir.1923); *Burns v. State,* 226 Ala. 117, 145 So. 436 (1933); *Connor v. State,* 225 Md. 543, 171 A.2d 699, 86 A.L.R.2d 892, cert. denied 368 U.S. 906, 82 S.Ct. 186, 7 L.Ed.2d 100 (1961); and cases collected at 73 A.L.R.2d 1187, 1203, § 7. See 47 Am.Jur.2d Jury, § 197, p. 787. The discretion of the trial court is not abused if the court requires open voir dire rather than sequestered voir dire. *Woodmansee v. Stoneman,* 133 Vt. 449, 344 A.2d 26 (1975). The same practice prevails in the federal courts. *United States v. Delval,* 600 F.2d 1098 (5th Cir. 1979); *United States v. Gerald,* 624 F.2d 1291 (5th Cir.1980), cert. denied 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). In these cases Rule 24, F.R.Cr.P., identical in substance to Rule 25, W.R.Cr.P., was construed and invoked. There is nothing in this record to indicate an abuse of discretion in the decision of the trial court to require open voir dire with the entire venire panel present, and we find no error in the court's decision in that regard.

The appellant relies almost exclusively upon *Hovey v. Superior Court of Alameda County,* 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980). We have considered carefully that decision and the conclusion of the majority that the open voir dire of the entire jury panel rather than a sequestered examination created a "presumption of guilt" in the minds of the potential jury members, and thus denied the constitutional right of a fair and impartial jury. The conclusion of the majority was not based upon any sort of empirical data but instead was premised upon academic studies which were highly speculative and conjectural. The presence of good authority contrary to *Hovey v. Superior Court of Alameda County,* supra, is sufficient refutation. *United States v. Puff,* 211 F.2d 171, 48 A.L.R.2d 540 (2nd Cir.1954). We in particular note that the Supreme Court was critical of the excessive length of voir dire engendered by the requirement of individual sequestered voir dire required by *Hovey.* Noting the importance of voir dire not only to the parties but to the entire fabric of our criminal justice system, the court remarked:

"We cannot fail to observe that a voir dire process of such length in and of itself undermines public confidence in the courts and the legal profession. The process is to ensure a fair impartial jury, not a favorable one. Judges, not advocates,

hear the evidence presented and render a just verdict and to determine the ground for any challenge for cause prescribed by §§ 1–121 (civil) or 7–224 (criminal), W.S.1957 [§ 1–11–203 (civil) or § 7–11–105 (criminal) ], as modified by judicial decision. Counsel will not:
"1. Ask questions of an individual juror that are susceptible of being asked collectively;
"2. Ask questions covered by and answered in juror questionnaire except to explore some questionnaire answer in greater depth;
"3. Repeat question asked and answered, though asked by opposing counsel;

"4. Use voir dire for the purpose of attempting to instruct the jury on the law; that is the court's function;
"5. Use voir dire for the purpose of arguing the case;
"6. Ask a juror what his verdict might be under any hypothetical situation based upon any expected evidence or otherwise.
"Upon failure of counsel to abide by this rule, the court may in such case assume voir dire of the jury. The court may in such case require counsel to submit in writing, specific questions to be asked by the court."

must control the process to make sure privileges are not so abused. Properly conducted it is inconceivable that the process could extend over such a period. We note, however, that in response to questions counsel stated that it is not unknown in California courts for jury selection to extend six months." *Press-Enterprise Company v. Superior Court of California, Riverside County,* supra., — U.S. at —, n. 9, 104 S.Ct. at 824, n. 9.

We perceive the views of Justice Richardson in his dissent in that case as being the most accurate, and we note that the Hovey majority view is criticized although not specifically challenged in *Press-Enterprise Company v. Superior Court of California, Riverside County,* supra.

Furthermore, our examination of the record in this case persuades us that if the potential jurors learned anything from the examination on voir dire of their fellow panel members it was the momentous nature of the decision they might be called upon to make. They were honestly and sincerely introspective with respect to attitudes they individually held concerning the imposition of capital punishment. We perceive the dignity with which each questioned venireman approached that very difficult subject to have redounded to the benefit of the appellant, contrary to his contention that it resulted in a presumption of guilt.

█ Pursuing his second contention under his first issue Engberg argues that his motion for a mistrial should have been granted. It was premised upon his complaint that the State used its peremptory challenge to remove death-inhibited jurors from the jury panel, and he thus was prevented from obtaining a jury which represented a "fair cross-section" of the community. Engberg argues that those jurors whom the Supreme Court of the United States held could not be constitutionally excused for cause in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), reh. denied 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968), cannot be challenged peremptorily. He contends that challenging such jurors peremptorily also resulted in a violation of his constitutional right to a fair and impartial jury. See *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). In *Collins v. State,* Wyo., 589 P.2d 1283 (1979), we manifested our agreement that an appellant is entitled to a panel of impartial jurors, and that *Taylor v. Louisiana,* supra, establishes the standards for impartiality. The appellant's argument, however, also goes beyond the requirements of *Taylor v. Louisiana,* supra, which relate to the selection of panels of veniremen, not the particular panel of twelve jurors which tries the case. In *Evans v. State,* Wyo., 653 P.2d 308 (1982), we dealt with a similar complaint with respect to the exercise of peremptory challenges by the prosecution. There we relied upon the rule with respect to unconstitutional use of peremptory challenges announced by the Supreme Court of the United States in *Swain v. State of Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), reh. denied 381 U.S. 921, 85 S.Ct. 1528, 14 L.Ed.2d 442 (1965). Within the limits imposed by *Swain v. State of Alabama,* supra, peremptory challenges must be recognized as partisan in nature and idiosyncratic in application. They are part of the tools of interested and able advocates. As such they always have been viewed as wholly discretionary and beyond inquiry with respect to motivation and intention.[6]

---

**6.** "The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." *State v. Thompson,* 68 Ariz. 386, 206 P.2d 1037 (1949); *Lewis v. United States,* 146 U.S. 370, 378, 13 S.Ct. 136, 139, 36 L.Ed. 1011 (1892). While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory challenges permits rejection for a reasonable or imagined partiality that is less easily designated or demonstrable. *Hayes v. State of Missouri,* 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887). It is often exercised upon the "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another," *Lewis v. United States,* supra, 146 U.S. at 376, 13

The State contends that its use of peremptory challenges may affirmatively act to promote the fairness and impartiality of the trial process. This is so because "the system should guarantee 'not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.' " *Swain v. State of Alabama,* supra, 380 U.S. at 220, 85 S.Ct. at 835, citing *Hayes v. State of Missouri,* 120 U.S. 68, 7 S.Ct. 350, 30 L.Ed. 578 (1887). Engberg's argument simply ignores an equally valid assumption that he exercised his peremptory challenges to excuse those members of the panel whom he perceived to have predilections favorable to capital punishment because of their responses to questions on voir dire.

■ The posture of the Supreme Court of the United States is that conceding the criteria in *Taylor v. Louisiana,* supra, a defendant in a criminal case is not entitled to a jury of any particular composition. *Fay v. New York,* 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947), reh. denied 332 U.S. 784, 68 S.Ct. 27, 92 L.Ed. 367 (1947). This is our rule in Wyoming as well. The fact that each party in a criminal case is afforded the same number of peremptory challenges manifests an intention to afford the defendant and the State an equal opportunity to secure an impartial jury. Rule 25(b), W.R.Cr.P.

■ As a final note, we are cognizant of the failure of the appellant to show that people who have inhibitions about capital punishment are similar to that class of distinctive groups requiring specific representation on the panel of veniremen. An examination of the cases dealing with groups which can be said to be "large [distinctive]" or "identifiable segments playing major roles in the community," (*Taylor v. Louisiana,* supra, 419 U.S. at 531, 95 S.Ct. at 698) or "a large and identi-

fiable segment of the community," (*People v. Payne,* 106 Ill.App.3d 1034, 62 Ill.Dec. 744, 436 N.E.2d 1046 (1982)), discloses that such groups are objectively identifiable. Groups which fit these criteria almost universally have been racial, ethnic or sexual in nature. See, e.g., *Swain v. State of Alabama,* supra, Blacks; *Hernandez v. State of Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), Mexican-American; *State v. Rossi,* La., 273 So.2d 265 (1973), Italian-American; *State v. Salinas,* 87 Wash.2d 112, 549 P.2d 712 (1976), Spanish-surname; and *Taylor v. Louisiana,* supra, women. The attitudes which appellant seeks to elevate into this category of cases are subjective. Each individual, as this record demonstrates, articulates his feelings in some different manner. It would be impossible to develop appropriate criteria to establish a class which even within the rule of *Swain v. State of Alabama,* supra, the State should be foreclosed from eliminating from the jury.

■ We next turn to the appellant's contention as articulated in his second issue that his death sentence must be set aside because the record does not encompass sufficient evidence of his intent to kill. The appellant concedes that there is no element of intent when the prosecution is premised upon a charge of felony murder. *Osborn v. State,* Wyo., 672 P.2d 777 (1983); *Jones v. State,* Wyo., 568 P.2d 837 (1977); and *Richmond v. State,* Wyo., 554 P.2d 1217 (1976). This view is traditional and unequivocal:

"Any act known to be dangerous to life, and likely in itself to cause death done for the purpose of committing a felony which caused death, should be murder." *Reginna v. Serne',* 16 Cox Crim. Case 311 (1887).

" * * * Whenever one, in doing an act with the design of committing a felony, takes the life of another, even accidentally, this is murder. * * * " *People v. De*

S.Ct. at 138, upon a juror's "habits and associations," *Hayes v. State of Missouri,* supra, 120 U.S. at 70, 7 S.Ct. at 351, or upon the feeling that "the bare questioning [a juror's] indifference may sometimes provoke a resentment," *Lewis v.*

*United States,* supra, 146 U.S. at 376, 13 S.Ct. at 138. *Swain v. State of Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), reh. denied 381 U.S. 921, 85 S.Ct. 1528, 14 L.Ed.2d 442 (1965).

*La Roi,* 36 Cal.App.2d 287, 291, 97 P.2d 836, 838 (1939).

" * * * Inasmuch as the homicide was committed in the perpetration of the robbery, it is not even necessary that there be an intent to kill. * * * " *People v. Nixon,* 33 Cal.2d 688, 693, 203 P.2d 748, 751 (1949), cert. denied sub nom. *Murphy [Murphey] v. People of State of California,* 338 U.S. 895, 70 S.Ct. 235, 94 L.Ed. 550 (1949).

To the same effect are the cases cited in *Osborn v. State,* supra, with respect to the effect of a statutory felony upon elements of first-degree murder when the charge is a felony murder.

Engberg has devised an argument, however, to the effect that *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), requires that intent to kill be demonstrated in order to impose a capital punishment in a felony murder case. Engberg's reliance upon *Enmund v. Florida,* supra, is misplaced. The Supreme Court of the United States there held that a capital sentence could not be imposed upon an accomplice convicted under a felony murder theory if the accomplice "does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 102 S.Ct. at 3376–3377. Engberg in this instance did kill himself, and he would qualify for capital punishment under the holding in *Enmund v. Florida,* supra. Furthermore, *Enmund v. Florida,* supra, is an accomplice case, not a case involving a principal. In our view it has no application to a case in which the defendant is the principal who accomplished the fatal act. *Osborn v. State,* supra.

Engberg argues, however, that this court has the duty of appraising the culpability of a defendant who has been sentenced to death. Engberg then urges that because the case went to the jury only upon a felony murder theory the only intent encompassed by the jury's finding of guilt is an intent to rob, and the verdict for that reason cannot sustain a capital punishment because the culpability of a defendant who intends to rob is relatively less than the culpability of a defendant who intends to kill. Engberg's argument is a sophisticated one, but as often is true of sophisticated arguments it encountered the hazard of sophistry and did not survive that risk.

There is no avenue for interpreting the evidence before the jury other than to conclude that Engberg willfully shot Vernon Rogers. Indeed the circumstances shown by the record raise a question as to whether Engberg went to the Buttrey Store to rob someone or to kill someone. The testimony of Kay Otto demonstrates that no demand for the bag or any other property was made prior to the firing of the fatal shot. In giving individualized consideration to the culpability of Engberg, following the mandates in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and *Enmund v. Florida,* supra, Engberg's eligibility for capital punishment is sustained on the basis of his personal responsibility and moral guilt. His conduct satisfies the "two principal social purposes" of the death penalty "retribution and deterrence of capital crimes by prospective offenders." *Enmund v. Florida,* supra, 102 S.Ct. at 3377, quoting *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 2929–2930, 49 L.Ed.2d 859 (1976), reh. denied 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976). We are not persuaded to the contrary by *State v. McDaniel,* 136 Ariz. 188, 665 P.2d 70 (1983), which was called to our attention by the appellant after the oral argument of this case.

In his third contention of error the appellant argues that it was error to permit the jury to consider "murder for pecuniary gain" and "murder * * * committed while the defendant was engaged * * * in the commission of * * * any robbery" as aggravating circumstances in the sentencing portion of the bifurcated capital offense trial. In its instructions the court advised the jury:

"The aggravating circumstances which you may consider are limited to such of

the following as may be established by the evidence:

"(a) That the murder was committed by a person under sentence of imprisonment;

"(b) That the defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person;

"(c) That the defendant, knowingly created a great risk of death to two (2) or more persons; .

"(d) That the murder was committed while the defendant was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit any robbery.

"(e) That the murder was committed for pecuniary gain."

In the jury's Findings and Recommendations of Sentence all five of the aggravating circumstances were found to be present.[7]

The Wyoming statute providing for capital punishment was adopted following a series of cases in the United States Supreme Court which dealt extensively with this issue. See *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), reh. denied 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 163 (1972); *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) reh. denied 406 U.S. 978, 92 S.Ct. 2407, 32 L.Ed.2d 677 (1972); *Gregg v. Georgia*, supra; *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), reh. denied 429 U.S. 875, 92 S.Ct. 198, 50 L.Ed.2d 158 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), reh. denied 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), reh. denied 429 U.S. 890, 97 S.Ct. 248, 50 L.Ed.2d 173 (1976); and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

■ The appellant relies upon Florida cases because our Wyoming statute is modeled in most respects after the Florida statute. We do give substantial weight to the Florida authorities interpreting that state's capital sentencing procedure. See *Apodaca v. State*, Wyo., 627 P.2d 1023 (1981). The statute is not peculiar to Florida, however, and we are not committed to following the interpretation of the Florida statute by its court if we conclude that such precedents are not sound or do not aptly reflect the policy of the State of Wyoming. *Wyoming Coal Mining Company v. State*, 15 Wyo. 97, 87 P. 337, 128 Am.St.Rep. 1014, reh. denied 87 P. 984 (1906); *Coad v. Cowhick*, 9 Wyo. 316, 63 P. 584, 87 Am.St.Rep. 953, reh. denied 66 P. 597 (1901). Accord, *Kraus v. Chicago, B. & Q. R. Co.*, 3 F.2d 277 (D.Wyo.1925). In *Provence v. State*, Fla., 337 So.2d 783 (1976), cert. denied 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977), the Florida court held that it was reversible error to present to the jury the aggravating circumstance that the murder was committed for pecuniary gain when the aggravating circumstance that the

---

7. These aggravating circumstances were submitted in accordance with § 6–4–102(h), W.S. 1977, which provides as follows:

"(h) Aggravating circumstances are limited to the following:

"(i) The murder was committed by a person under sentence of imprisonment;

"(ii) The defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person;

"(iii) The defendant knowingly created a great risk of death to two (2) or more persons;

"(iv) The murder was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing or discharging of a destructive device or bomb;

"(v) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

"(vi) The murder was committed for pecuniary gain;

"(vii) The murder was especially heinous, atrocious or cruel;

"(viii) The murder of a judicial officer, former judicial officer, county attorney, or former county attorney, during or because of the exercise of his official duty."

homicide occurred during a robbery also was presented. The Florida court concluded that "both subsections [i.e., aggravating circumstances] refer to the *same aspect* of the defendant's crime." *Provence v. State,* supra, 337 So.2d, at 786. Other Florida cases are consistent with this rule. See *Armstrong v. State,* Fla., 399 So.2d 953 (1981); *Enmund v. State,* Fla., 399 So.2d 1362 (1981); and *Enmund v. Florida,* supra, 102 S.Ct. at 3371.

For us the analysis of the North Carolina court is persuasive. In *State v. Oliver,* 302 N.C. 28, 274 S.E.2d 183 (1981), that court held that the aggravating circumstance identified as murder for pecuniary gain examines the defendant's motive, not his conduct, and while not an element of the offense the jury properly may consider his motive with respect to the issue of a capital sentence. Later that court held that the aggravating circumstance of murder for pecuniary gain almost always appropriately will be submitted to the jury where the murder is committed during the course of an armed robbery. *State v. Irwin,* 304 N.C. 93, 282 S.E.2d 439 (1981). The thrust of the North Carolina court's holdings is that these two aggravating circumstances both may be submitted to the jury.

■ Our analysis of the aggravating circumstances set forth in our statute, § 6–4–102(h), W.S.1977, leads us to the conclusion that the sentencing authority must consider first the character of the defendant (aggravating circumstances i through iii); secondly, the character of the defendant's act (aggravating circumstances iv and vii); thirdly, the motivation for the defendant's act (aggravating circumstances v, and vi); and lastly the character of the victim of the act (aggravating circumstances viii). To hold, as the Florida courts have, that both of these aggravating circumstances should not be submitted to a jury in an instance such as this weights the sentencing aspect of the trial in favor of the defendant, because it forecloses the jury from considering aspects of the entire matter which are of significance. Furthermore, the rule is premised upon an assumption that the number of aggravating circumstances has some independent significance.

■ As the capital sentencing statute is applied in Wyoming, the analysis of the defendant's conduct is qualitative, and the jury is not permitted to base its determination upon the quantitative weighing of aggravating circumstances. This policy was expressed appropriately in this case by the court's instruction to the jury to this effect:

"In making this determination you must use your reasoned judgment. You must weigh the mitigating circumstances against the aggravating circumstances and in doing so consider the following:

"1. No numerical weight is assigned to any of the mitigating or aggravating circumstances.

"2. The enumeration of the aggravating and mitigating circumstances does not indicate the weight to be given to any such circumstance.

"3. One aggravating circumstance may be of such a nature as to outweigh one or more mitigating circumstance.

"4. One mitigating circumstance may be of such a nature as to outweigh one or more aggravating circumstance."

This concept has been approved in substance by even the Florida court. In *Armstrong v. State,* supra, 399 So.2d at 953, the court said:

"The fact that the murders took place in the course of a robbery, and that the criminal episode was motivated by pecuniary gain constitute *one valid aggravating circumstance* amply established by the evidence." (Emphasis added.)

The sentencing authorities' balancing of aggravating and mitigating circumstances which the Florida court previously had said is never a "simple summing of aggravating and mitigating circumstances," *State v. Dixon,* Fla., 283 So.2d 1 (1973), cert. denied sub. nom. *Hunter v. Florida,* 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), was not disturbed by the separate articulations of what is a single aspect although having separately identifiable characteristics.

The rule in Wyoming is that it is not error to submit these two aggravating circumstances to a jury in a case such as this. We espouse the view of the North Carolina courts to the extent that it in substance does depart from that of the Florida court.

The final argument posed by Engberg in his appeal is that of proportionality of the sentence. It is his contention that the death penalty in this case is excessive and is disproportionate when compared to the penalty imposed in similar cases, considering both the crime and the defendant. We perceive this contention as being substantially identical to the statutory duty of the court set forth in § 6–4–103(d)(iii), which provides as follows:

"(d) With regard to the sentence, the court shall determine if:

\* \* \* \* \* \*

"(iii) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

While it may not be of great importance in the State of Wyoming, Engberg's approach assumes that the proportionality review is constitutionally mandated. The validity of that assumption is not subject to criticism based upon prior law, but the Supreme Court of the United States addressed that proposition in *Pulley v. Harris*, — U.S. —, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)), and by holding that the proportionality review is not constitutionally mandated by the Eighth Amendment to the Constitution of the United States, laid to rest the contrary contention. Because of the statutory duty in Wyoming we still are required to do the proportionality review, and accept the proposition that *Solem v. Helm*, — U.S. —, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), is instructive with respect to the requirements for proportionality review.

In *Solem v. Helm*, supra, the court said at 103 S.Ct. 3010:

"In sum, a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions."

We need not concern ourselves further with the first of these criteria because in *Pulley v. Harris*, supra, the Supreme Court of the United States made it clear that the proportionality review prescribed under our statute presumes that the death sentence is not disproportionate to the crime of murder in the traditional sense. We then proceed to consider the sentences imposed on other criminals in this jurisdiction and the sentences imposed for commission of the same crime in other jurisdictions.

Most recently the sentences imposed upon other criminals in Wyoming have been summarized in *Osborn v. State*, Wyo., 672 P.2d 777, 801–803 (1983). The cases considered in that context were *Hopkinson v. State*, Wyo., 664 P.2d 43 (1983); *Cloman v. State*, Wyo., 574 P.2d 410 (1978); *Kennedy v. State*, Wyo., 559 P.2d 1014 (1977); *Pixley v. State*, Wyo., 406 P.2d 662 (1965); and *State v. Brown*, 60 Wyo. 379, 151 P.2d 950 (1944). We do not think it helpful to reiterate the summary of those several cases as found in *Osborn v. State*, supra. To those cases we would add references to *Jones v. State*, Wyo., 568 P.2d 837 (1977), and *Richmond v. State*, Wyo., 554 P.2d 1217 (1976), which were companion cases involving co-defendants in a felony murder committed during a robbery. No death sentence was imposed in those cases because of the invalidity of the statute as prescribed in *Kennedy v. State*, supra. *Flores v. State*, Wyo., 572 P.2d 746 (1977), involving a murder of a prison guard by an incarcerated inmate is in the same general category because the capital sentence provision of the statute was defective under *Kennedy*. Also in this category we would place the case of *Collins v. State*, Wyo., 589 P.2d 1283 (1979), involving a barroom shooting resulting in a conviction for

premeditated murder. The sentencer was not allowed to consider the death penalty because the aggravating circumstances portion of the statute was severed in accordance with *Kennedy*.

 We also note the cases of *Parkhurst v. State*, Wyo., 628 P.2d 1369 (1981), cert. denied 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981), and *Shaffer v. State*, Wyo., 640 P.2d 88 (1982), in which the State did not seek the death penalty. The exercise of the prosecutorial discretion in such an instance does not foreclose the sentencing authority from imposing capital punishment in other cases. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

 Having considered sentences imposed on other criminals in the State of Wyoming, we conclude that the imposition of the capital sentence in this case is not excessive or disproportionate when the case is compared to other capital cases in Wyoming. Concededly the facts are different, but each capital case must be a special one, and the facts are not likely to be duplicated. Still this case fits within a pattern of cases in which the State of Wyoming has seen fit to adjudicate a capital punishment, and the result must stand in this case.

In applying the third of the criteria indicated in *Solem v. Helm*, supra, we have looked for similar cases from other jurisdictions in which a capital sentence was imposed. In accordance with the statute we refer to those cases rather summarily. In all these instances the death penalty was imposed for felony murder during a robbery. We find the following federal cases: *Collins v. Lockhart*, 707 F.2d 341 (8th Cir. 1983) (shotgun slaying of elderly employer by 20-year-old for contents of billfold); *Bell v. Watkins*, 692 F.2d 999 (5th Cir.1982) (execution shotgun slaying of service station attendant); *Washington v. Watkins*, 655 F.2d 1346 (5th Cir.1981), cert. denied 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982) (shotgun slaying of proprietor of convenience store); *Spinkellink v. Wainright*, 578 F.2d 582 (5th Cir.1978), reh. denied 441 U.S. 937, 99 S.Ct. 2064, 60 L.Ed.2d 667 (1979) (petty criminal shot partner to death while partner was sleeping). We also discovered the following state cases: *State v. Narcisse*, La., 426 So.2d 118 (1983) (stabbing death of elderly woman); *State v. Bartholomew*, 98 Wash.2d 173, 654 P.2d 1170 (1982) (shooting death of laundromat attendant); *State v. Blazak*, 131 Ariz. 598, 643 P.2d 694 (1982), cert. denied 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982) (assailant in ski mask shot and killed tavern bartender and patron); *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243 (1982) cert. denied 459 U.S. 1056, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982), reh. denied 459 U.S. 1189, 103 S.Ct. 839, 74 L.Ed.2d 1031 (1983) (shotgun murder of service station attendant); *State v. Thompson*, 278 S.C. 1, 292 S.E.2d 581 (1982) (shooting death of grocery store proprietor); *Brewer v. State*, Ind., 417 N.E.2d 889 (1981), cert. denied 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982), reh. denied 458 U.S. 1132, 103 S.Ct. 18, 73 L.Ed.2d 1403 (1982) (shooting death by intruders posing as police); *State v. Taylor*, 304 N.C. 249, 283 S.E.2d 761 (1981) (shooting deaths of car owners during auto thefts); *People v. Lewis*, 88 Ill.2d 129, 58 Ill.Dec. 895, 430 N.E.2d 1346 (1981), cert. den. 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982) (shooting death of security guard during bank robbery); *Briley v. Commonwealth*, 221 Va. 532, 273 S.E.2d 48 (1980), cert. den. 451 U.S. 1031, 101 S.Ct. 3022, 69 L.Ed.2d 400 (1981) (shooting death of car owner during auto theft); *Dampier v. State*, 245 Ga. 427, 265 S.E.2d 565 (1980), cert. denied 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 161 (1981), reh. denied 449 U.S. 1119, 101 S.Ct. 932, 66 L.Ed.2d 848 (1980) (execution slaying of gas station attendant); *Culberson v. State*, Miss., 379 So.2d 499 (1979), reh. denied 449 U.S. 1103, 101 S.Ct. 903, 66 L.Ed.2d 831 (1981) (shooting death of delivery truck driver); *Collier v. State*, 244 Ga. 553, 261 S.E.2d 364 (1979), cert. denied 445 U.S. 946, 100 S.Ct. 1346, 63 L.Ed.2d 781 (1980) (shooting death of investigating officer during escape from robbery of florist shop); *State v. Richmond*, 114

Ariz. 186, 560 P.2d 41 (1976), cert. denied 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977), application denied 434 U.S. 1323, 98 S.Ct. 8, 54 L.Ed.2d 34 (1977), reh. denied 434 U.S. 976, 98 S.Ct. 537, 54 L.Ed.2d 469 (1977) (car driven over unconscious victim); *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977), cert. denied 434 U.S. 912, 98 S.Ct. 313, 54 L.Ed.2d 198 (1977), reh. denied 434 U.S. 988, 98 S.Ct. 622, 54 L.Ed.2d 485 (1977) (shooting death of civilian aiding police capture felon fleeing from robbery scene).

As is true with our conclusion with respect to cases from the State of Wyoming, we are satisfied that when we compare this case to the facts in other cases in which the death penalty has been imposed, it is clear that this capital punishment is not excessive or disproportionate. This case fits well within the range of the cases in which capital punishments have been imposed, and we are satisfied that it appropriately was imposed by the sentencing authority in this instance.

Even though we have concluded that there is no error to be found with respect to the issues urged by Engberg, as we noted in *Osborn v. State*, supra, we must perform some additional functions. Section 6-4-103, W.S.1977, provides in pertinent part:

"(c) The supreme court of Wyoming shall consider the punishment as well as any errors enumerated by way of appeal.

"(d) With regard to the sentence, the court shall determine if:

"(i) The sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

"(ii) The evidence supports the jury's or judge's finding of an aggravating circumstance as enumerated in W.S. 6-54.2 [§ 6-4-102] and a lack of sufficient mitigating circumstances which outweigh the aggravating circumstances;

"(iii) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

"(e) The court shall include in its decision a reference to those similar cases which it took into consideration. * * *"

In the preceding portion of this opinion we have dealt with the question of whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, and we shall not treat further with that matter.

We are satisfied that the evidence in this case supports the jury's finding of the five aggravating circumstances, and that there is a lack of sufficient mitigating circumstances which outweigh the aggravating circumstances. In accordance with the standard reaffirmed in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), reh. denied 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), we have examined the record for proof of the aggravating circumstances beyond a reasonable doubt. We also have conformed to the principle set forth in *Hopkinson v. State*, supra, 664 P.2d at 86, that viewing the evidence in the light most favorable to the prosecution any rational trier of fact could have found the essential elements beyond a reasonable doubt. Every one of the five aggravating circumstances which were submitted to this jury could have been found to exist beyond a reasonable doubt.

The evidence of record established the appellant's prior escape from the Missouri Department of Correction's minimum security facility in 1978, and this evidence demonstrates that the murder was committed by a person under sentence of imprisonment. Essentially the same evidence demonstrates beyond a reasonable doubt that the defendant previously was convicted of another murder in the first degree or a felony involving the use or threat of violence to the person. The conviction which resulted in the sentence that Engberg was serving when he escaped from the Missouri correctional facility was for murder of a night watchman in connection with an armed robbery. Engberg was convicted of

these offenses in 1963 and sentenced to life imprisonment in the State of Missouri.

The testimony in this case further demonstrated beyond a reasonable doubt that Engberg seriously endangered the lives of Kay Otto and other persons present in the parking lot at the time of the robbery and murder, as well as that of his victim, Vernon Rogers. In shooting errantly at persons in parked vehicles in the lot, Engberg manifested an utter disregard for lives of innocent persons. This evidence demonstrated beyond a reasonable doubt that Engberg knowingly created a great risk of death to two or more persons. As to the fourth aggravating circumstance, which was that the murder was committed in the course of a robbery, a finding beyond a reasonable doubt with respect to this circumstance was essential to his conviction for felony murder. Finally, there could be no reasonable doubt by a reasonable fact finder that Engberg's motive for the robbery in which the murder was committed was pecuniary gain. Competent evidence demonstrated that he stole more than $13,000 in cash, checks and food stamps, and that these events occurred when Engberg did not have other funds available. We are satisfied that the jury's findings of all five aggravating circumstances was justified under the appropriate standard and must be accepted on appeal.

By its verdict the jury in this instance rejected all of the mitigating circumstances included in the statute. Section 6–4–102(j), W.S.1977, provides as follows:

"(j) Mitigating circumstances shall be the following:

"(i) The defendant has no significant history of prior criminal activity;

"(ii) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

"(iii) The victim was a participant in the defendant's conduct or consented to the act;

"(iv) The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor;

"(vi) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;

"(vii) The age of the defendant at the time of the crime."

The jury went one step further. It found in response to a suggestion that it should consider any other circumstances deemed to be mitigating, that:

"The robbery and murder committed by this Defendant may have been caused by his economic and family conditions."

It was the ultimate conclusion of the jury, however:

"That sufficient mitigating circumstances do not exist to outweigh the aggravating circumstances found to exist and the jury recommends that the Defendant be sentenced to death."

Our examination of the evidence persuades us of the correctness of the jury's appraisal of the aggravating and mitigating circumstances, and the jury's finding and conclusion are supported by the evidence.

Finally we can find nothing in the record to suggest that this sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor. The case was carefully and deliberately tried. The jury initially was instructed that their decision must be rendered "with sincere judgment and sound discretion, uninfluenced by sentiment, conjecture, or by any passion or prejudice against any of the litigants in this case or by public opinion or public feeling." Nothing in the record suggests a departure from the standard given to the jury. A change of venue was granted to Engberg from Natrona County to Converse County because of the possibility of prejudice arising out of pretrial publicity. The jury was sequestered throughout the course of the trial, and carefully admonished to avoid any outside contact dealing with the case, particularly the impressions of the public media. Engberg does not argue nor is there anything to indicate any detrimental arbitrary occur-

rences in the conduct of the trial; any improprieties by officers of the court; any evidence of jury misconduct; or any prejudicial or inflammatory outbursts by those of the general public in attendance. The rule of sequestration was applied to prospective witnesses. The jury returned its ultimate verdict after three and one-half hours of deliberation, and this evidences a careful and thorough consideration of the issues related to punishment. We are satisfied that Engberg received the constitutionally mandated fair and impartial trial which is his due, and that no impermissible influences of passion, prejudice or any other arbitrary factor can be discerned in the record before us.

There is no error with respect to the issues argued by the appellant. With respect to the statutory requirements relating to our consideration of the punishment as well as any errors enumerated by way of appeal, we find no error. The judgment and sentence is affirmed with respect to the sentence of twenty-five to thirty years imposed on Count II, and the sentence of death imposed as to Count I. The case is remanded to the district court with directions to the judge of the district court pronouncing the sentence of death to fix a new date therefor and for the taking of all necessary steps in connection therewith pursuant to the provisions of §§ 7–13–901, et seq., W.S.1977. In accordance with our usual practice the execution shall be stayed pending an opportunity to Engberg to seek certiorari to the Supreme Court of the United States in a timely manner.

ROSE, Justice, dissenting.

" * * * Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases." *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954 [2965], 57 L.Ed.2d 973 (1978).

In a capital-punishment case the sentencing phase may well be the most significant aspect of the entire proceeding. A capital-sentencing scheme, to meet constitutional standards, must insure that the jury's discretion is "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859, reh. denied 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976). Proper channeling of the sentencing authority's discretion is essential to provide a

" * * * meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. 238, 313, 92 S.Ct. 2726 [2764], 33 L.Ed.2d 346, reh. denied 409 U.S. 902, [93 S.Ct. 89, 34 L.Ed.2d 164] (1972) (White, J., concurring).

To meet these constitutional standards and goals, the Wyoming legislature established certain factors to be considered by the jury as aggravating the offense of first-degree murder.[1] The presence of one or more of these factors can justify the imposition of the death penalty. For these enumerated circumstances to fulfill their purpose, they must be construed and applied so as to focus the jury's attention upon the distinguishing features of the case before it.

The majority in the instant case approve a rule which permits the jury to consider § 6–4–102(h)(vi) (now § 6–2–102(h)(vi)), W.S.1977, murder "for pecuniary gain," and § 6–4–102(h)(iv) (now § 6–2–102(h)(iv)), W.S.1977, "murder * * * committed while the defendant was engaged * * * in the commission of * * * any robbery," as separate aggravating circumstances in a robbery-murder case. Rather than emphasize the differences between first-degree murder cases, this rule obscures relevant distinctions because it (1) treats an essential

1. Section 6–4–102(h) (now § 6–2–102(h)), W.S. 1977, limits the sentencing authority's consideration to eight potential aggravating circumstances. Majority opinion, n. 7.

element of the crime—the underlying robbery in this robbery-murder case—as an *aggravating* circumstance and (2) affords double consideration of the fact that the defendant stole money.

## AN ESSENTIAL ELEMENT OF AN OFFENSE CANNOT AGGRAVATE THAT SAME OFFENSE

The majority do not specifically address the issue of whether the jury may properly consider the underlying felony as an aggravating circumstance in a felony-murder case. The North Carolina Supreme Court considered this question at length, however, in *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551, cert. denied 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1979). In that case the defendant was convicted of robbery-murder and sentenced to death. The jury had considered the fact that the murder was committed during the course of a robbery and the fact that the murder was committed for pecuniary gain as aggravating circumstances. The appellate court remanded the case for resentencing, holding that the act of robbery constituted the basis for, and an element of, the felony-murder conviction and, therefore, could not be considered an *aggravating* circumstance in support of the death penalty. In reaching this conclusion, the court discussed the disadvantaged position of the felony murderer compared to that of the premeditating murderer, when the underlying felony constitutes an aggravating factor:

"No element of a first degree murder which is committed with premeditation and deliberation is included in the list of aggravating circumstances found in G.S. 15A–2000(e). A defendant convicted of a felony murder, nothing else appearing, will have one aggravating circumstance 'pending' for no other reason than the nature of the conviction. On the other hand, a defendant convicted of a premeditated and deliberated killing, nothing else appearing, enters the sentencing phase with no strikes against him. This is highly incongruous, particularly in light of the fact that the felony murder may have been unintentional, whereas, a premeditated murder is, by definition, intentional and preconceived.

"It is well settled in this jurisdiction that when the State, in the trial of a charge of murder, uses evidence that the murder occurred in the perpetration of another felony so as to establish that the murder was murder in the first degree, the underlying felony becomes a part of the murder charge to the extent of preventing a further prosecution of the defendant for, or a further sentence of the defendant for, commission of the underlying felony. [Citations.] Although designed to prevent double jeopardy, a problem with which we are not here confronted, we think the merger rule sheds light on the question before us. Once the underlying felony has been used to obtain a conviction of first degree murder, it has become an element of that crime and may not thereafter be the basis for additional prosecution or sentence. Neither do we think the underlying felony should be submitted to the jury as an aggravating circumstance in the sentencing phase when it was the basis for, and an element of, a capital felony conviction.

"We are of the opinion that, nothing else appearing, the possibility that a defendant convicted of a felony murder will be sentenced to death is disproportionately higher than the possibility that a defendant convicted of a premeditated killing will be sentenced to death due to the 'automatic' aggravating circumstance dealing with the underlying felony. To obviate this flaw in the statute, we hold that when a defendant is convicted of first degree murder under the felony murder rule, the trial judge shall not submit to the jury at the sentencing phase of the trial the aggravating circumstance concerning the underlying felony." 257 S.E.2d at 567–568.

The North Carolina Supreme Court reaffirmed this holding in *State v. Oliver*, 302 N.C. 28, 274 S.E.2d 183 (1981), and *State v. Silhan*, 302 N.C. 223, 275 S.E.2d 450 (1981).

The Alabama Court of Criminal Appeals held in *Bufford v. State*, Ala.Cr.App., 382 So.2d 1162, 1173–1174 (1980), that robbery cannot be used to aggravate capital robbery, "or else the appellant is punished twice for the same act." This position was reaffirmed in *Reed v. State*, Ala.Cr.App., 407 So.2d 153, 161 (1980), underlying conviction rev'd in *Ex Parte Reed*, Ala., 407 So.2d 162 (1981), where the court said:

"The crime charged consisted of two elements: (1) the robbery and (2) the intentional killing. An element of the offense charged cannot be used as an aggravating circumstance to that offense. In other words robbery cannot be used as an aggravating circumstance to the crime of capital robbery."

I find the reasoning of these courts sound. Automatically instructing the sentencing body on the underlying felony in a felony-murder case does nothing to aid the jury in its task of distinguishing between first-degree homicides and defendants for the purpose of imposing the death penalty. Relevant distinctions dim, since all participants in a felony-murder, regardless of varying degrees of culpability, enter the sentencing stage with at least one aggravating factor against them.

*Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), illustrates the extent to which distinctions can blur in a robbery-murder situation. In that case, the trial judge had sentenced the "lookout" in a robbery-murder case to death despite the fact that he had not intended to kill, attempted to kill or killed anyone. The judge justified his decision by specifying, inter alia, that the capital felony was committed during the course of a robbery and for pecuniary gain. The United States Supreme Court reversed the judgment upholding the death penalty on other grounds, but concluded that Enmund's "punishment must be tailored to his personal responsibility and moral guilt." 458 U.S. at 801, 102 S.Ct. at 3378.

A comparison of the sentencing treatments afforded first-degree-murder defendants further highlights the impropriety of using the underlying felony to aggravate felony-murder. The felony murderer, in contrast to the premeditated murderer, enters the sentencing stage with one aggravating circumstance automatically charged against him. This disparity in sentencing treatment bears no relationship to legitimate distinguishing features upon which the death penalty might constitutionally rest. Because the constitution requires a meaningful basis for distinguishing between capital cases, I would have held that the underlying felony may never be considered in aggravation of a felony murder.

## DOUBLE CONSIDERATION OF AN AGGRAVATING FACT UNDERMINES THE CAPITAL–SENTENCING SCHEME

Generally, courts have disapproved of sentencing instructions which permit the jury to treat the same factual situation as embracing two or more aggravating circumstances. In *Provence v. State*, Fla., 337 So.2d 783, cert denied 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1976), discussed in the majority opinion, the Florida Supreme Court found reversible error where the jury considered the commission of a robbery and pecuniary gain as two separate circumstances aggravating robbery-murder. The court reasoned:

" * * * [H]ere, as in all robbery-murders, both subsections [aggravating circumstances] refer to the *same aspect* of the defendant's crime. Consequently, one who commits a capital crime in the course of a robbery will always begin with two aggravating circumstances against him while those who commit such a crime in the course of any other enumerated felony will not be similarly disadvantaged. Mindful that our decision in death penalty cases must result from more than a simple summing of aggravating and mitigating circumstances, *State v. Dixon*, 382 [283] So.2d 1, 10 (Fla.1973), we believe that Provence's pecuniary motive at the time of the murder constitutes only one factor which we

must consider in this case." 337 So.2d at 786.

Double consideration of the same aspect of a crime can impair the process of weighing the aggravating circumstances against the mitigating circumstances, with the result that the sentence of death must be vacated. *Armstrong v. State,* Fla., 399 So.2d 953 (1981).

In similar fashion the Alabama Supreme Court in *Cook v. State,* Ala., 369 So.2d 1251 (1979), held that the trial judge erred in applying duplicative aggravating circumstances to a robbery-murder:

" * * * At Cook's sentencing hearing the trial judge found that two aggravating circumstances were present: (4)—a capital felony committed in the course of a robbery, and (6)—a capital felony committed for pecuniary gain. In so finding we feel that the learned trial judge misconstrued the latter aggravating circumstance, in effect condemning Cook twice for the same culpable act—stealing money. Subsection 6 would, of course, cover a variety of crimes committed with the hope of financial benefit, ranging from 'murder-for-hire' to an heir killing his benefactor to gain his inheritance. But we do not think it appropriate to apply this aggravating circumstance to situations already condemned under subsection 4 which by definition involve an attempt at pecuniary gain. Thus, to avoid repetition, subsection 6 should not be applied to a robbery. The trial court erred in considering it and including it in the findings of fact." 369 So.2d at 1256.

The California Supreme Court recently embraced this concept in *People v. Harris,* 36 Cal.3d 36, 201 Cal.Rptr. 782, 798, 679 P.2d 433, 449 (1984), saying:

" * * * [T]he constitutionally mandated objective of focusing on the particularized circumstances of the crime and the defendant is undercut when the defendant's conduct is artifically inflated by the multiple charging of overlapping special circumstances or multiple special circumstances based on an indivisible course of conduct having one principal criminal purpose."

The Nebraska Supreme Court, in *State v. Rust,* 197 Neb. 528, 250 N.W.2d 867, 874, reh. denied 434 U.S. 988, 98 S.Ct. 622, 54 L.Ed.2d 485 (1977), solved the problem of overlapping circumstances by narrowly construing the pecuniary-gain factor:

" * * * We construe this factor to apply (1) to the hired gun, (2) to the hirers of the gun, and (3) to murder motivated primarily by a desire for pecuniary gain as in the case of a murder of an insured by the beneficiary of a life insurance policy for the purpose of obtaining the proceeds, or the murder of a testator by a legatee or devisee to secure a legacy or a devise. Where, as here, the murder was committed as part of an attempt to escape or to conceal the identity of the perpetrator, we do not consider the murder was committed for a pecuniary gain even though the result could possibly have been to enable Rust to keep the proceeds of the robbery. We think it is not reasonable to construe the definitions in such a manner as to make them overlap and make the same identical facts constitute two aggravating circumstances."

The Nebraska court, in *State v. Stewart,* 197 Neb. 497, 250 N.W.2d 849, 864 (1977), expounded on the harm in permitting double consideration of an aggravating factor:

"We also note that were subsection (1)(c) [murder committed for pecuniary gain] to be construed to apply to murder committed in the course of a robbery, it would appear that defendants who commit such murders would, from the outset, have two aggravating circumstances applied to them, (1)(b) [murder committed to conceal commission of crime or identity of perpetrator] and (1)(c); whereas in the case of a premeditated murder, neither circumstance would apply. We do not believe the Legislature intended to treat persons who commit murder in the course of a robbery more harshly than those who commit premeditated murder. We also find that subsections (1)(b) and

(1)(c) are separate and distinct circumstances and should be construed so as not to overlap."

The majority in the instant case reject the reasoning of the above cases and hold that the jury may consider both robbery and pecuniary gain as aggravating circumstances in a robbery-murder case. The majority submit that pecuniary gain concerns the motive of the defendant while robbery goes to the character of his act. Both factors must be submitted to the jury, according to the majority opinion, to permit consideration of "aspects of the entire matter which are of significance." The majority rely on North Carolina cases which hold that the jury may consider "for pecuniary gain" as an aggravating factor in robbery-murder cases, since that factor goes to the defendant's motive and is not an element of the offense.

As discussed above, the perpetration of a robbery may not be considered as an aggravating factor in robbery-murder cases in North Carolina; hence the jury cannot consider both robbery and pecuniary gain as death-supporting circumstances in such cases. *State v. Irwin*, 304 N.C. 93, 282 S.E.2d 439 (1981). Furthermore, in *State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979), the North Carolina Supreme Court ruled improper the application of two aggravating circumstances [2] to the same evidence:

"We think the submission of the two issues on the same evidence was improper. This amounted to an unnecessary duplication of the circumstances enumerated in the statute, resulting in an auto-

matic cumulation of aggravating circumstances against the defendant." 257 S.E.2d at 587.

The court commented in dicta, however, that dual consideration of circumstances might be appropriate for examining the defendant's motive, rather than a specific factual element.

I find the majority's distinction between "motive" and "character of the act," as these factors apply to a robbery, much too subtle to be a part of the balancing process where a man's life is at stake.[3] A decision to impose death must be " 'controlled by clear and objective standards' " [4] that provide "specific and detailed guidance" [5] to the decision-maker, if arbitrary and capricious action is to be avoided.

In summary, the Federal Constitution requires that a capital-sentencing procedure be one that

" * * * guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." *Jurek v. Texas*, 428 U.S. 262, 274, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929, reh. denied 429 U.S. 875, 97 S.Ct. 198 [50 L.Ed.2d 158] (1976).

In the present case, the jury was allowed to consider an essential element of defendant's crime—the felony—as a circumstance which enhanced his culpability sufficiently to justify the death penalty. In addition, the trial court instructed the jury on two aggravating circumstances which describe the same, indivisible feature of the offense—the stealing of money. Considera-

---

**2.** The two aggravating circumstances under consideration in that case were G.S. 15A–2000(e)(4), " '[t]he capital felony was committed for the purpose of avoiding or preventing a lawful arrest * * *,' " 257 S.E.2d at 585, and G.S. 15A–2000(e)(7), the " 'capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.' " 257 S.E.2d at 587.

**3.** The jury actually found the defendant's motive to be a *mitigating* circumstance in this case—a fact which underscores the impropriety of treating pecuniary gain as a separate "motive" com-

ponent of robbery. The jury specified this nonstatutory mitigating circumstance:

"The robbery and murder committed by this Defendant may have been caused by his economic and family conditions."

**4.** *Gregg v. Georgia*, supra, 428 U.S. at 198, 96 S.Ct. at 2936, quoting from *Coley v. State*, 231 Ga. 829, 834, 204 S.E.2d 612, 615 (1974).

**5.** *Proffitt v. Florida*, 428 U.S. 242, 253, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913, reh. denied 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976) (opinion of Stewart, Powell and Stevens, JJ.).

tion of robbery and pecuniary gain in the sentencing phase of appellant's trial prevented the jury from rendering the individualized decision essential in capital cases. Therefore, this case should have been remanded for resentencing upon consideration of the proper aggravating circumstances. As we said in *Hopkinson v. State*, Wyo., 664 P.2d 43, 60 (1983):

"* * * [W]e must not compromise the weighing process between permissible aggravating circumstances and mitigating circumstances. The scales must not be tipped by impermissible factors leaving us in a quandary as to what the jury would have done had impermissible factors not been present. [*Hopkinson v. State*, Wyo., 632 P.2d 79, 170–172 (1981).] "* * * We accept the proposition that improper aggravating circumstances cannot go into the calculus of the decision of the sentencing authority."

## THE DEATH PENALTY IS UNCONSTITUTIONAL

I continue to adhere to my position, announced in *Hopkinson v. State*, Wyo., 632 P.2d 79, cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1981) (dissenting opinion at 199–216), that the death penalty in all circumstances is cruel and unusual punishment and, therefore, violative of Art. 1, §§ 14 and 15 of the Wyoming Constitution.

"* * * I find the sentence of death to be—not only cruel in fact—unusual in fact—but cruel and unusual in law.

"When I say it is cruel in law, I rely heavily upon the parameters within which the testing process must take place as delineated in the Wyoming constitutional provision which says the criminal laws of this state must be *founded in* 'the humane principles of reformation and prevention' (Art. 1, § 15, Wyoming Constitution) and the doctrine which has been identified by the United States Supreme Court when it has been said that we will test the cruelty of punishment from time to time by taking into account

the 'evolving standards of decency that mark the progress of a maturing society.' " 632 P.2d at 215 (Rose, J., dissenting).

## ORDER DENYING PETITION FOR REHEARING

BY THE COURT.*

This case came on before the court upon the Petition for Rehearing filed herein by the appellant, Roy Lee Engberg, and the court, having carefully considered the Petition for Rehearing and being fully advised, finds that the petition does not encompass any question or matter necessary to a correct decision which has been overlooked by the court; seeks to present a point for the first time in the case; does not demonstrate a resonable probability that the court arrived at an erroneous conclusion; and that the Petition for Rehearing should be denied, and it therefore is

ORDERED that the appellant's Petition for Rehearing be, and the same hereby is, denied.

ROSE, Justice, dissenting.

Appellant's petition for rehearing asks this court to address whether or not the underlying felony, i.e., robbery, in a felony-murder case can be submitted to the sentencing jury as an aggravating circumstance in support of the death penalty as was done in the case at bar. This question was not addressed by the majority in its opinion. All that the court holds in that opinion is that (a) "murder * * * for pecuniary gain" and (b) "murder * * * committed while the defendant was engaged in the commission of * * * any robbery" can both be submitted as aggravating circumstances in the sentencing part of a bifurcated capital-offense trial. But this decision does not touch the question raised by the petitioner. Engberg argues that the facts which establish the elements of capital murder in the guilt phase cannot be made to do double duty by also being utilized to establish an

---

* ROSE, Justice, dissenting.

aggravating circumstance for life-or-death sentencing purposes.

Since the issue was not previously addressed, and since it is fundamental to the rights of the defendant, I would grant the petition, receive briefs and hear argument.

I write with deep concern about this court's attitude toward capital appeals and particularly its order denying Engberg's petition for rehearing in the case at bar. The order seems to say that, where capital punishment is the issue, the end justifies the means, there being a shared conviction among the members of the majority that the defendant is guilty as charged and therefore he does not deserve rehearing consideration. This is a dangerous trend. It can be seen in other instances. For example, I hold that *State v. Heiner*, 683 P.2d 629 (1984) is a result-oriented opinion because, while, under the law of evidence, it is arguable that the trial court may have been wrong when it entered its suppression order in that case, the question is really not arguable which asks whether or not this court has appellate jurisdiction to entertain certiorari or any other interlocutory appeal not provided by statute—it plainly and simply does not.[1] Yet certiorari was granted in *State v. Heiner* in the face of overwhelming underlying common-law precedent to the contrary and without even mentioning numerous opinions of this court which hold that we do not possess certiorari jurisdiction where the State seeks relief from an adverse decision where, as in Wyoming, a separate statutory procedure for appellate review is in place.

Result-oriented opinions are one thing where only freedom is at issue[2]—but life and death call into question such profound considerations of human mortality, that most civilized nations of the world have concluded that mankind has no jurisdiction for decision-making in these areas and have left these profound contemplations to higher authority.

As it holds that the death penalty does not constitute cruel or unusual punishment,[3] the majority of this court not only feels that we can dispositively resolve the unfathomable questions pertaining to the mortality of our brothers and sisters in the human family, but, in the matter at bar, the majority refuse to even address an issue which in truth was not considered by this court in the first instance but which is imperative to a full resolution of the rights of the petitioner in this life-or-death matter. The majority of the justices do this with an order that disposes of heretofore unresolved propositions of law without brief or argument when they say that the petition for rehearing is denied because it

(a) *"seeks to present a point for the first time"* (emphasis added), which, according to the law of rehearing, is to improperly come to a decision upon a plain-error point of law without brief or argument;

(b) *"finds that the petition does not encompass any question or matter necessary to a correct decision which has been overlooked by the court"* (emphasis added), when it is patently true that the majority of the court have not previously considered whether robbery can aggravate the crime of robbery-murder;

(c) *"does not demonstrate a reasonable probability that the court arrived at an erroneous conclusion."* (Emphasis added.) What does this mean? Does it mean that it is all right to kill Engberg because he is a bad man even though we

---

1. See my dissenting opinions in *State v. Heiner*, supra, and *State v. Sodergren*, 686 P.2d 521 (1984.)

2. "Freedom" can be predicated by the adjective "only" in no other situation except when, as here, it is being compared to life or death.

3. Only faintly heard and dimly remembered these days are the thoughts contained in *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2

L.Ed.2d 630 (1958), where Chief Justice Warren, writing for the Court, observed that the words of the Eighth Amendment to the Federal Constitution are not precise and their scope is not static. The Chief Justice said that the cruel-and-unusual-punishment clause

"* * * must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."

do it for impermissible reasons—reasons that will—when Engberg is gone—live to haunt all who survive by having their constitutional and statutory rights jeopardized?

What are we saying with the court's order denying the petition for rehearing? It seems to me that we are saying the same thing we said in *State v. Heiner,* supra, and *State v. Sodergren,* 686 P.2d 521 (1984), when we granted certiorari even though we had no jurisdiction, namely: Even if we have done it wrong—that is, without authority of law—even if we did not here consider whether or not robbery can aggravate the crime of robbery-murder, we are, nevertheless, satisfied with Engberg's death sentence and we are therefore not even going to listen to the argument on the issue because no matter how valid the defendant's legal position might be, we are convinced that Mr Engberg is such a despicable individual as should come to his death at the hands of the State whether or not he has received the right guaranteed to him by law.

This is too bad. It is too bad—not only because it holds life and death so lightly but because, it seems to me, it shows a sort of cavalier disrespect for the rights which are guaranteed to all of us by the Bill of Rights and it can hardly be denied that it does violence to the law of rehearing.

Having said this, I turn to the legal specifics of my objection to the order signed this day by the Chief Justice.

In denying the petition for rehearing, the majority say that the petition presents no matter necessary to a correct decision which the court overlooked and raises a point for the first time in the case. The question presented, however, is central to a proper resolution of this appeal since it concerns sentencing guidelines mandated by the constitution in a capital punishment case. The matter implicates substantial rights of the accused and was properly before this court under the plain-error doctrine. Rule 7.05, W.R.A.P.; *Browder v. State,* Wyo., 639 P.2d 889, 895 (1982).

Furthermore, in death-penalty cases, the legislature has decreed that this court must consider the propriety of any aggravating circumstance found by the jury, even if the defendant presents no appeal whatsoever. Section 6-2-103, W.S.1977. Therefore, under the plain-error rule and statutory directive, this court is bound to examine all aggravating-circumstance considerations to determine whether they supplied a constitutionally permissible basis for imposition of the death penalty. Therefore, we may not now refuse to consider the question which has been called to our attention by a petition for rehearing on the ground that appellant failed to call the matter to our attention in the original appeal.

Although the majority refuse to hear the issue raised by petitioner, they nevertheless conclude—without briefing from the parties and without citing any authority whatsoever—that the petition "does not demonstrate a reasonable probability that the court arrived at an erroneous conclusion." In my judgment, this reason for denying the petition not only points to a result-oriented disposition of this matter, but it serves to violate petition-for-rehearing law in its most fundamental aspect. Without meeting or even considering the arguments and supporting authority presented by petitioner and discussed in my dissenting opinion, *Engberg v. State,* 686 P.2d 563 (1984), the majority conclude that appellant's position cannot prevail. Thus, the order denying rehearing impermissibly reaches a legal conclusion with respect to the underlying issue raised in the petition. In so doing, the majority not only deprive the justices of this court the right to have the law briefed and the points argued, but they also deprive the appellant of his right to know the basis for this court's conclusions.

I would have granted this petition for rehearing in order that we might properly and fully consider an issue which we had a duty but failed to consider in the first instance and which is essential to a dispositive resolution in this case.